# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                    No. CR 05-2369 JB

DANIEL ZUNI,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum and Objections to Presentence Report, filed January 3, 2007 (Doc. 106)("Zuni's Objections"). The Court held a sentencing hearing on January 10, 2007. The primary issues are: (i) whether the Court should find by a preponderance of the evidence that the Defendant Daniel Zuni committed aggravated sexual abuse against Denise Billy; (ii) whether the Court should add six levels to Zuni's offense level because his kidnaping victim was sexually exploited; (iii) whether the Court should add two levels to Zuni's offense level for obstruction of justice; and (iv) whether the Court should grant a downward variance from the guideline imprisonment range consistent with its authority under United States v. Booker, 543 U.S. 220 (2005). Because the Court does not find, by a preponderance of the evidence, that Zuni raped Billy, the Court will sustain Zuni's objections in part; to the extent that Zuni attempts to remove information from the Presentence Investigation Report ("PSR") that the Court has considered, the Court will overrule those objections. Because the Court believes that the Guidelines have produced a reasonable sentence in this case, the Court will not grant a variance from the guideline imprisonment range.

## PROCEDURAL BACKGROUND

On October 26, 2005, a federal grand jury returned an two-count Indictment against Zuni charging him with kidnaping and aggravated sexual abuse in violation of 18 U.S.C. §§ 1201(a)(2) and 2241(a).  The Court held a jury trial in this case from July 10, 2006 through July 14, 2006.  See Clerk's Minutes, filed July 10, 2007 (Doc. 99).  On July 14, 2006, the jury returned a verdict finding Zuni guilty of kidnaping as charged in Count 1 in the Indictment and not guilty of aggravated sexual abuse as charged in Count 2 of the Indictment.  See Verdict, filed July 14, 2006 (Doc. 96).

Zuni submitted objections to the PSR that the United States Probation Office ("USPO") prepared, and the USPO submitted an Addendum.  See Zuni's Objections at 1.  Zuni contends that the USPO's Addendum is a cosmetic revision to the PSR and that it is no different than the initial report. See id.  Accordingly, Zuni has submitted a sentencing memorandum and objections to the PSR.

## SENTENCING LAW AND GUIDELINES

Real conduct is the cornerstone of the United States Sentencing Guidelines.  But when the Guidelines require the sentencing court to consider conduct for which the defendant was acquitted and to enhance the defendant's sentence based on the judge's finding that the conduct occurred by a preponderance of the evidence, the court's actions can be viewed as at tension with the jury's verdict of acquittal.  Nevertheless, the Tenth Circuit has made it clear that, not only can the sentencing court consider conduct for which the defendant was acquitted, the sentencing court, under the Guidelines, makes findings about that conduct by a preponderance of the evidence.

# I.   CONSTITUTIONALITY OF CONSIDERING RELEVANT CONDUCT AND THE APPLICABLE EVIDENTIARY STANDARD.

In a sentencing proceeding, the United States need prove only the existence of a fact relevant to sentencing by a preponderance of the evidence, rather than beyond a reasonable doubt.  The recent upheaval in federal sentencing jurisprudence has not affected the applicable standard for sentencing proceedings in the Tenth Circuit.  Moreover, conduct for which the defendant was acquitted may fairly be used as relevant conduct so long as the preponderance of the evidence standard is satisfied.

The Supreme Court has expressly and repeatedly approved of sentencing courts' reliance upon, and consideration of, conduct for which the defendant was acquitted under the Guidelines' sentencing regime.  The practice is, in essence, an artifact of the lower burden of proof that has always been applicable to sentencing proceedings.  Furthermore, the use of conduct for which the defendant was acquitted for sentencing purposes is consistent with Fifth Amendment due process and the Sixth Amendment right to jury trial.  The Supreme Court and the Tenth Circuit have already both definitively spoken on this issue.

## 1.   Supreme Court Relevant Conduct Jurisprudence.

In Witte v. United States, 515 U.S. 389 (1995), the Supreme Court upheld the use of uncharged conduct at sentencing against a double jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and a 1991 attempt to import marijuana.  See id. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See id.   At sentencing, the district court concluded that, because the 1990 attempt was part of the same

continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3 and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See id. at 394.

In September 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See id.  The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See id. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the Double Jeopardy Clause's prohibition against multiple punishments.  See id.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other Circuit Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See id. at 255 & n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See Witte v. United States, 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  Id. at 401.  The Supreme Court reasoned that sentencing

courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being 'punished' for uncharged relevant conduct as though it were a distinct criminal 'offense.'" Id. at 402 (quoting United States' Brief at 23).  Sentencing enhancements do not punish a defendant for uncharged offenses; rather they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  Witte v. United States, 515 U.S. at 403.

In United States v. Watts, 519 U.S. 148 (1997), the Supreme Court, in a per curiam opinion, relied upon the holding of Witte v. United States and upheld a sentencing judge's use of conduct for which the defendant had been acquitted against a double jeopardy challenge.  In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every Circuit Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit --and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence. See id. at 149 (citing, among other authorities, United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).

There were two Ninth Circuit cases on appeal in United States v. Watts.  See United States v. Watts, 67 F.3d 790 (9th Cir. 1995); United States v. Putra, 78 F.3d 1386 (9th Cir. 1996).  In United States v. Watts, a jury convicted Vernon Watts of possessing cocaine with intent to distribute, but acquitted him of using a firearm in relation to a drug offense.  See id. at 149-50. Despite Watts' acquittal on the firearms count, the district court found by a preponderance of the evidence that Watts had possessed guns in connection with the drug offense, and, at sentencing, added two offense

levels to his base offense level pursuant to U.S.S.G. § 2D1.1(b)(1). <u>See id.</u> at 150.  The Ninth

Circuit vacated the sentence, holding that "a sentencing judge may not, 'under <u>any</u> standard of

proof,' rely on facts of which the defendant was acquitted." <u>Id.</u> (quoting <u>United States v. Watts</u>, 67

F.3d 790, 797 (9th Cir. 1995))(emphasis in original).

The second case on appeal, <u>United States v. Putra</u>, involved a defendant, Cheryl Putra, whom

authorities had videotaped selling cocaine to a government informant on two separate occasions.

<u>See</u> <u>United States v. Watts</u>, 519 U.S. at 150.  The jury convicted Putra of aiding and abetting

possession with intent to distribute one ounce of cocaine in association with the first sale, but

acquitted her of aiding and abetting possession with intent to distribute five ounces of cocaine in

association with the second transaction.  At the sentencing hearing, the district court determined that

the United States had proved by a preponderance of the evidence that Putra had been involved in

both sales, explained that the second sale was relevant **conduct u**nder U.S.S.G. § 1B1.3, and

aggregated the amounts of both sales to calculate Putra's base offense level under the Guidelines.

<u>See</u> <u>United States v. Watts</u>, 519 U.S. at 151.  "Reasoning that the jury's verdict of acquittal

manifested an 'explicit rejection' of Putra's involvement in the [second] transaction," the Ninth

Circuit reversed and vacated the sentence.  <u>Id.</u> (quoting <u>United States v. Putra</u>, 78 F.3d at 1389).

The Supreme Court began its analysis in <u>United States v. Watts</u> with 18 U.S.C. § 3661: "No

limitation shall be placed on the information concerning the background, character, and conduct of

a person convicted of an offense which a court of the United States may receive and consider for the

purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.  <u>See</u> <u>United States v. Watts</u>, 519

U.S. at 151.  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the

longstanding principle that sentencing courts have broad discretion to consider various kinds of

information," and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.  The Supreme Court distinguished the different limitations on the presentation of evidence at trial and at sentencing:  "Highly relevant -- if not essential -- to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."  Id. (quoting Williams v. New York, 337 U.S. 241, 247 (1949)).  The Supreme Court noted that, "under the pre-Guidelines sentencing regime, it was 'well established that a sentencing judge may take into account facts introduced at trial relating to other charges, even ones of which the defendant has been acquitted.'" United States v. Watts, 519 U.S. at 152 (quoting United States v. Donelson, 695 F.2d 583, 590 (D.C. Cir. 1982)(Scalia, J.)).

The Supreme Court in United States v. Watts then turned to the Guidelines.  The Supreme Court acknowledged that the Guidelines, like 18 U.S.C. § 3661, articulate "in sweeping language the conduct that a sentencing court may consider in determining the applicable guideline range." United States v. Watts, 519 U.S. at 152-53 (citing U.S.S.G. § 1B1.3).  The Supreme Court appeared to be persuaded by the Guidelines' conclusion that, at least for offenses involving "a pattern of misconduct that cannot readily be broken down into discrete, identifiable units that are meaningful for purposes of sentencing,"  U.S.S.G. § 1B1.3 cmt. background,  "relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses," United States v. Watts, 519 U.S. at 153 (quoting U.S.S.G. §1B1.3 comment., backg'd)(emphasis added in United States v. Watts).  Considering 18 U.S.C. § 3661 and the Guidelines in totality, the Supreme Court stated that, "[i]n short, we are convinced that a sentencing court may consider

conduct of which a defendant has been acquitted." United States v. Watts, 519 U.S. at 154.

Relying on its earlier decision in Witte v. United States, the Supreme Court in United States v. Watts went on to explain why its ruling did not violate the Double Jeopardy Clause. The Supreme Court in United States v. Watts reaffirmed its holding that "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction." 519 U.S. at 154 (citing Witte v. United States, 515 U.S. at 395).

The Supreme Court in United States v. Watts criticized the Ninth Circuit for "fail[ing] to appreciate the significance of the different standards of proof that govern at trial and sentencing," and stated that "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." 519 U.S. at 155 (quoting United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984)). The Supreme Court agreed with the dissenting judge in United States v. Putra, the Honorable J. Clifford Wallace, then-Chief United States Circuit Judge, and adopted the proposition that "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge." United States v. Watts, 519 U.S. at 155. The Supreme Court in United States v. Watts reasoned that, because "[a]n acquittal is not a finding of any fact[,] . . . [w]ithout specific jury findings, no one can logically or realistically draw any factual finding inferences." Id. (quoting United States v. Putra, 78 F.3d at 1394 (Wallace, C.J., dissenting)).

Because the jury's verdict was only dispositive regarding whether there was a reasonable doubt as to the defendant's guilt, the Supreme Court in United States v. Watts concluded that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." 519 U.S. at 156 (quoting

Dowling v. United States, 493 U.S. 342, 349 (1990)).  The Supreme Court acknowledged, however, "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence."  United States v. Watts, 519 U.S. at 156.  In footnote two, the Supreme Court cited cases from the Supreme Court and from the First, Second, Third, Seventh, Eighth, Ninth, and the District of Columbia Circuits that suggested that clear and convincing evidence might be required for judicial findings that result in extraordinary sentence enhancements.  See id. at 156 n.2.  The Tenth Circuit, however, which has rejected a higher standard, created the split in the circuits.  See United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1990)("At least as concerns making guideline calculations the issue of a higher than a preponderance standard is foreclosed in this circuit.").  In the end, the Supreme Court in United States v. Watts reversed the Ninth Circuit and held that even "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."  519 U.S. at 157.

In United States v. Watts, Justices Stevens and Kennedy filed separate dissenting opinions.  In his dissent, Justice Stevens conceded that 18 U.S.C. § 3661 supports the per curiam opinion's "narrow holding that sentencing courts may sometimes consider conduct of the defendants underlying other charges of which they had been acquitted," but countered that the statute "sheds no light on whether the district judges' application of the Guidelines in the manner presented in these cases was authorized by Congress, or is allowed by the Constitution."  519 U.S. at 161 (Stevens, J., dissenting)(internal quotation omitted).  Justice Stevens noted that, "[b]y their own terms, the Guidelines incorporate the broadly inclusive language of [U.S.C.] § 3661 only into those portions

of the sentencing decision in which the judge retains discretion." Id. at 162 (Stevens, J., dissenting). Justice Stevens concluded that, if the evidence upon which a defendant was acquitted is used to increase the defendant's base offense level, it should be proven beyond **a reasonable doubt. Id. at 163 n.2 (Stevens, J., dissenting)(**"Since Watts' base offense level was increased by this evidence, I believe it should have been proved beyond a reasonable doubt."). Justice Stevens distinguished Watts' and Putra's cases from the Supreme Court's decision in McMillan v. Pennsylvania, 477 U.S. 79 (1986), a case in which the defendant's minimum sentence was enhanced on the basis of a fact proved by preponderance of the evidence. In McMillan v. Pennsylvania, the Supreme Court upheld a Pennsylvania sentencing provision that established a minimum sentence of five-years imprisonment if the sentencing judge found by a preponderance of the evidence that a defendant convicted of certain enumerated felonies visibly possessed a firearm during the commission of the offense. See 477 U.S. at 80.

Justice Stevens distinguished McMillan v. Pennsylvania from the facts in United States v. Watts, because under the sentencing scheme in McMillan v. Pennsylvania, the maximum sentence was unchanged by the judge's finding. See United States v. Watts, 519 U.S. at 166 (Stevens, J., dissenting). Justice Stevens noted that the actual sentence imposed upon the defendant in McMillan v. Pennsylvania "was within the range that would have been available to the judge even if the enhancing factor had not been proved." United States v. Watts, 519 U.S. at 166 (Stevens, J., dissenting). Justice Stevens reasoned that "the holding [in McMillan v. Pennsylvania] should not be extended to allow a fact proved by only a preponderance to increase the entire range of penalties within which the sentencing judge may lawfully exercise discretion." United States v. Watts, 519 U.S. at 166 (Stevens, J., dissenting). Justice Stevens concluded his dissent:

> Whether an allegation of criminal conduct is the sole basis for punishment or merely one of several bases for punishment, we should presume that Congress intended the new sentencing Guidelines that it authorized in 1984 to adhere to longstanding procedural requirements enshrined in our constitutional jurisprudence.  The notion that a charge that cannot be sustained by proof beyond a reasonable doubt may give rise to the same punishment as if it had been so proved is repugnant to that jurisprudence.

Id. at 169-70.

Justice Kennedy, writing separately in dissent, echoed Justice Stevens' concerns and criticized the per curiam opinion for failing to address distinctions between uncharged conduct, like that addressed in Witte v. United States, and conduct related to a charge for which the defendant was acquitted.  See United States v. Watts, 519 U.S. at 170 (Kennedy, J., dissenting).  Justice Kennedy expressed concern that, at a minimum, "increas[ing] a sentence based on conduct underlying a charge for which the defendant was acquitted does raise concerns about undercutting the verdict of acquittal."  Id.

### 2.    Tenth Circuit Relevant Conduct Jurisprudence.

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.   In United States v. Coleman, 947 F.2d 1424 (1991), the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See id. at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See id. at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for

a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."), and United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply two-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy").

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit in United States v. Coleman ruled that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  The Tenth Circuit based its conclusion on evidence that: (i) two weapons had been located at the arrest scene; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See id. at 1429.  The Tenth Circuit summarized that, in reviewing federal caselaw, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  Id.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that drug quantities used as relevant conduct to establish a defendant's offense level should be proven by clear and convincing evidence rather than by a mere preponderance of the evidence.  See 11 F.3d at 1512.  Washington objected to his sentencing, because the drug quantity the district court considered as relevant conduct, and which the court found by a preponderance of the evidence,  increased his guideline sentence range, from 210 to 262 months, to life.  Washington argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  Id. at 1515.

Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," see id. at 1516, it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." Id. (citing McMillan v. Pennsylvania, 477 U.S. at 84). While the phrase "ordinary case" might suggest there are exceptions, the Tenth Circuit's remaining language indicated that it was shutting the door on that possibility. The Tenth Circuit concluded that, "[a]t least as concerns making guideline calculations[,] the issue of a higher than a preponderance standard is foreclosed in this circuit." United States v. Washington, 11 F.3d at 1516. Finally, more recent Tenth Circuit decisions -- issued subsequent to the Supreme Court's holdings in Witte v. United States and United States v. Watts -- have reaffirmed the Tenth Circuit's position regarding the sentencing court's consideration of relevant conduct. See United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear and convincing evidence standard at sentencing and noting that this argument was "foreclosed by binding precedent" in the Tenth Circuit); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(same).

   **3.   Sixth Amendment Jurisprudence.**

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution limited this

-13-

discretion and that the Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490.  In Blakely v. Washington, the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. at 303 (additional emphasis removed).  In United States v. Booker, the Supreme Court expanded its earlier holdings to apply to sentencing enhancements that exceeded maximum sentences under the Sentencing Guidelines. See 543 U.S. at 239 ("Regardless of whether the legal basis of the accusation is in a statute or in guidelines promulgated by an independent commission, the principles behind the jury trial right are equally applicable.").

The majority opinions in Apprendi v. New Jersey, Blakely v. Washington, and in the constitutional majority in United States v. Booker reflect the Supreme Court's[1] concern that sentencing enhancements based on uncharged, dismissed, and acquitted crimes may undermine, if not directly contravene, many of the fundamental components of the adversary system that the Framers intended -- specifically notice, jury trial, and proof beyond a reasonable doubt. See United States v. Booker, 543 U.S. at 238 ("[T]he Framers would not have thought it too much to demand that, before depriving a man of [ten] more years of his liberty, the State should suffer the modest inconvenience of submitting its accusation to 'the unanimous suffrage of twelve of his equals and neighbors,' rather than a lone employee of the State.")(quoting Blakely v. Washington, 542 U.S. at

_____

[1]The same five justices -- Stevens, Scalia, Souter, Thomas, and Ginsburg -- joined in all three opinions.

-14-

313).  Justice Scalia noted in <u>Blakely v. Washington</u> that sentencing factors cannot be elevated to the "tail which wags the dog of the substantive offense."  542 U.S. at 307 (quoting <u>McMillan v. Pennsylvania</u>, 477 U.S. at 88).  Justice Scalia explained that this threshold would be crossed when legislatures -- and presumably the federal Sentencing Commission -- enact sentencing mechanisms that  exceed "the judicial estimation of the proper role of the judge."  <u>Blakely v. Washington</u>, 542 U.S. at 307.

In <u>United States v. Booker</u>, the Supreme Court expressly rejected, however,  any argument that its holding was inconsistent with its earlier holding in <u>United States v. Watts</u>.  <u>See</u> <u>United States v. Booker</u>, 543 U.S. at 240 & 240 n.4.  In his majority opinion in <u>United States v. Booker</u>, Justice Stevens -- joined by Justices Scalia, Souter, Thomas, and Ginsburg -- described the issue in <u>United States v. Watts</u> as "a very narrow question regarding the interaction of the Guidelines with the <u>Double Jeopardy Clause</u>."  <u>United States v. Booker</u>, 543 U.S. at 240 n.4.  Justice Stevens stated that the Supreme Court in <u>United States v. Watts</u> "held that the <u>Double Jeopardy Clause</u> permitted a court to consider acquitted conduct in sentencing a defendant under the Guidelines,"[2] but limited the holding by pointing out that "[i]n neither <u>Witte [v. United States]</u> nor <u>[United States v.] Watts</u>  was there any contention that the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the <u>Sixth Amendment</u>."  <u>United States v. Booker</u>, 543 U.S. at 240.  Justice Stevens concluded that the issue the Supreme Court confronted in <u>United States v. Booker</u> "simply

---

[2]Justice Breyer's majority opinion in <u>United States v. Booker</u> -- which Chief Justice Rehnquist, and Justices O'Connor, Kennedy, and Souter joined -- characterizes the scope of the holding in <u>United States v. Watts</u> in a very similar fashion.  Justice Breyer states that the Supreme Court "held in <u>United States v. Watts</u> that a sentencing judge could rely for sentencing purposes upon a fact that a jury had found unproved (beyond a reasonable doubt)."  <u>United States v. Booker</u>, 543 U.S. at 251.

was not presented" in <u>United States v. Watts</u>.  <u>United States v. Booker</u>, 543 U.S. at 240.

Justice Stevens' opinion in <u>United States v. Booker</u> asserted that the constitutional infirmity of the Guidelines' sentencing regime was not in permitting judges to consider acquitted conduct, but that the Guidelines were binding on district judges.  <u>See id.</u> at 233.  The constitutional majority in <u>United States v. Booker</u> indicated that there would have been no Sixth Amendment constitutional violations in the cases before them if the Guidelines were advisory.  <u>See id.</u>

Justice Thomas, writing separately in dissent in <u>United States v. Booker</u>, reached a similar conclusion in finding that the Guidelines, as applied to Defendant Freddie Booker, were unconstitutional because they "<u>required</u> the judge to make findings that increased Booker's offense level beyond the Guidelines range authorized by the jury."   <u>Id.</u> at 319 (Thomas, J., dissenting)(emphasis added).   Justice Thomas also questioned the constitutionality of the preponderance-of-the-evidence standard as applied to fact finding underlying sentencing enhancements.   In critiquing the commentary to U.S.S.G. § 6A1.3, which states that "the Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case," <u>see</u> U.S.S.G. § 6A1.3 cmt., Justice Thomas countered that the Supreme Court's holding in <u>United States v. Booker</u> "corrects this mistaken belief," 543 U.S. at 319 n.6 (Thomas, J., dissenting).  Justice Thomas continued: "The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant."  <u>Id.</u>

Consistent with this conclusion, the Supreme Court in <u>United States v. Booker</u> found those

provisions of the Federal Sentencing Reform Act of 1984 that made the Guidelines mandatory, see 18 U.S.C. § 3553(b)(1), or which rely upon the Guidelines' mandatory nature, see 18 U.S.C. § 3742(e), incompatible with the Sixth Amendment, see United States v. Booker, 543 U.S. at 245. Accordingly, the Supreme Court in United States v. Booker severed and excised 18 U.S.C. § 3553(b)(1) -- the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guideline range -- from the remainder of the Act, thus "mak[ing] the Guidelines effectively advisory." 543 U.S. at 245.  The Supreme Court's holding in United States v. Booker "requires a sentencing court to consider Guideline ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well." Id. at 245-46.

The Supreme Court has recently confirmed that an advisory guidelines system comports with the Sixth Amendment.  In Cunningham v. California, 127 S. Ct. 856 (2007), Justice Ginsburg, joined by the other four justices who had been part of the constitutional majority in United States v. Booker and Chief Justice Roberts, noted that, despite disagreement over the most appropriate method to remedy the mandatory Guidelines' constitutional infirmity, all nine justices that took part in the United States v. Booker decision agreed that "the Federal Guidelines would not implicate the Sixth Amendment were they advisory." Cunningham v. California, 127 S. Ct. at 866.  The only other member of the current Supreme Court that did not participate in the United States v. Booker decision, Justice Alito, also acknowledged in Cunningham v. California that the Supreme Court in United States v. Booker "unanimously agreed that judicial factfinding under a purely advisory guidelines system would [] comport with the Sixth Amendment." Cunningham v. California, 127 S. Ct. at 874 (Alito, J., dissenting.).

Not only did making the Guidelines advisory remedy the Supreme Court's Sixth Amendment

concerns, it seems to have alleviated the constitutional concerns regarding the appropriate burden of proof that existed under the mandatory system.  A person who is found guilty of a crime beyond a reasonable doubt is exposed to the maximum punishment the statute of conviction allows, rather than the maximum allowed under the Guidelines, and it is therefore constitutional to sentence the guilty defendant any where within the range based on facts proved only by a preponderance of the evidence.  See, e.g., Harris v. United States, 536 U.S. 545, 558 (2002)("Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.").  Nevertheless, since United States v. Booker, at least one United States Circuit Judge and several United States District Judges have concluded that sentencing based upon conduct for which the defendant was acquitted is unconstitutional.   See United States v. Faust, 456 F.3d 1342, 1352 (11th Cir. 2006)(Barkett, J., specially concurring)("When a sentencing judge finds facts that could, in themselves, constitute entirely free-standing offenses under the applicable law -- that is, when an enhancement factor could have been named in the indictment as a complete criminal charge -- the Due Process Clause of the Fifth Amendment requires that those facts be proved beyond a reasonable doubt."); United States v. Coleman, 370 F. Supp. 2d 661, 671 (S.D. Ohio 2005)(Marbley, J.)("[T]he jury's central role in the criminal justice system is better served by respecting the jury's findings with regard to authorized and unauthorized conduct.")(emphasis in original); United States v. Pimental, 367 F. Supp. 2d 143, 152 (D. Mass. 2005)(Gertner, J.)("To consider acquitted conduct trivializes 'legal guilt' or 'legal innocence' -- which is what a jury decides -- in a way that is inconsistent with the tenor of the recent case law."); Judge Nancy Gertner, Circumventing Juries, Undermining Justice: Lessons from Criminal Trials and Sentencing, 32 Suffolk U. L. Rev. 419, 436

-18-

(1999)("Actual innocence or actual guilt is less significant in a constitutional criminal justice system than legal guilt or legal innocence, adjudicated by a jury.")(hereinafter Circumventing Juries).

In United States v. Pimental, the Honorable Nancy Gertner, United States District Judge for the District of Massachusetts, discussed at length the federal sentencing scheme in the post Blakely v. Washington and United States v. Booker environment, and called for judges to apply a "beyond a reasonable doubt" standard to relevant conduct.  See United States v. Pimental, 367 F. Supp. 2d at 153.  According to Judge Gertner both the plain language and reasoning of United States v. Booker "substantially undermines the continued vitality of United States v. Watts."  United States v. Pimental, 367 F. Supp. 2d at 150.  Judge Gertner observed that "it makes absolutely no sense to conclude that the Sixth Amendment is violated whenever facts essential to sentencing have been determined by a judge rather than a jury, . . . and also conclude that the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing."  United States v. Pimental, 367 F. Supp. 2d at 150 (internal citation omitted).

Judge Gertner's discussion was premised on her view that "[t]he jury is intended to be the centerpiece of the criminal justice system."  United States v. Pimental, 367 F. Supp. 2d at 150.  Quoting from her law review article, Judge Gertner stated that, determining "more than actual truth, guilt, or innocence, its decisions represent a popular conception of a 'just verdict.'"  Id. (quoting Circumventing Juries at 433).  Judge Gertner argued in United States v. Pimental that, "when a jury acquit[s] a defendant based on [the beyond a reasonable doubt] standard, one would have expected no additional criminal punishment would follow."  United States v. Pimental, 367 F. Supp. 2d at 150 (quoting Circumventing Juries at 433).  According to Judge Gertner, this expectation is "a matter of simple justice."  United States v. Pimental, 367 F. Supp. 2d at 150 (quoting Apprendi v. New

Jersey, 530 U.S. at 476.).

Judge Gertner concluded that her findings were consistent with Justice Stevens' principal opinion in United States v. Booker, but found that "this position, that one can consider acquitted conduct because the Guidelines are now advisory, seems to hark back to the period pre-mandatory Guidelines." United States v. Pimental, 367 F. Supp. 2d at 151.

> What the judge did in sentencing [before the Guidelines] -- a specialized, professional function -- was totally different from what the jury did. There was no Sixth Amendment issue, or even the requirement of full evidentiary safeguards because sentencing facts did not have binding and determinate consequences. Thus, just as during the pre-Guidelines discretionary sentencing regime, when a judge could consider acquitted conduct in the mix of sentencing facts, so he or she can do so now after [United States v.] Booker.

Id. at 151-52. Judge Gertner distinguished this earlier sentencing regime from sentencing under the mandatory Guidelines, because "while pre-Guideline data may have included acquitted conduct in the mix of sentencing factors, such data did not have quantifiable consequences; in a guideline regime, each fact has a determinate impact." United States v. Pimental, 367 F. Supp. 2d at 152 n.16 (quoting Circumventing Juries at 433).

Judge Gertner described the current status of federal sentencing law as a hybrid system embodying elements of the purely discretionary pre-Guidelines sentencing and elements of the mandatory rule-based Guidelines sentencing. See United States v. Pimental, 367 F. Supp. 2d at 152. In Judge Gertner's estimation, the nature of this system "has certain consequences in terms of the significance of acquitted conduct, and more generally, the procedural protections at sentencing." Id. These consequences derive from the fact that "when a court considers acquitted conduct it is expressly considering facts that the jury verdict not only failed to authorize; it considers facts of which the jury expressly disapproved." Id. Judge Gertner also criticized the distinction jurists have

made between the jury's role of deciding guilt and the judge's task of deciding facts.  Judge Gertner contended that this distinction is disingenuous "in this hybrid regime where rules still matter, and certain facts have important, if not dispositive, consequences."  Id. at 153.  Judge Gertner summarized: "To tout the importance of the jury in deciding facts, even traditional sentencing facts, and then to ignore the fruits of its efforts makes no sense -- as a matter of law or logic."  Id.

As a result of her concern for the integrity of jury verdicts, Judge Gertner reasoned, "[e]ven if [United States v.] Watts emerged unscathed from [United States v.] Booker, and a judge may consider all facts, including acquitted conduct, the standard of proof to be applied should be beyond a reasonable doubt."  United States v. Pimental, 367 F. Supp. 2d at 153.  Because "[c]ertain facts . . . continue to assume inordinate importance in the sentencing outcome," Judge Gertner concluded in United States v. Pimental that "they should be tested by our highest standard of proof."  Id.

As a final point, Judge Gertner asserted that, "[i]ndeed, even if the Sixth Amendment's jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth Amendment's Due Process requirement is."  Id.  Judge Gertner concluded:

> We cannot have it both ways: We cannot say that facts found by the judge are only advisory, that as a result, few procedural protections are necessary and also say that the Guidelines are critically important.  If the Guidelines continue to be important, if facts the Guidelines make significant continue to be extremely relevant, then Due Process requires procedural safeguards and a heightened standard of proof, namely, proof beyond a reasonable doubt.

Id. at 154.

In United States v. Coleman, 370 F. Supp. 2d 661 (S.D. Ohio 2005), the Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, took a position similar to Judge Gertner in United States v. Pimental.  Judge Marbley acknowledged in United States v.

<u>Coleman</u> that, "[i]n interpreting the practical effects of the two majority opinions in <u>[United States</u> <u>v.] Booker</u>, most courts agree that judicial fact-finding may be made by a preponderance of the evidence so long as the court is operating in an advisory regime."  <u>United States v. Coleman</u>, 370 F. Supp. 2d at 667.  Judge Marbley disagreed with this conclusion and indicated that, in his opinion, all enhancements should be determined under the beyond a reasonable doubt standard.  <u>See</u> <u>id.</u> at 668.  Nevertheless, because of  what he described as compelling dicta from the United States Court of Appeals for the Sixth Circuit, and a "multi-circuit consensus," Judge Marbley stated that he would "continue to review enhancements, with the exception of those relating to acquitted conduct, by a preponderance of the evidence."  <u>Id.</u>

Judge Marbley recognized conduct for which the defendant has been acquitted as exceptional circumstances and asserted that "the beyond a reasonable doubt standard reflects the seriousness of the determinations made within the criminal justice system, as opposed to the civil system."  <u>Id.</u> at 668 n.8 (citing <u>United States v. Gray</u>, 362 F. Supp. 2d 714, 720 (S.D. W. Va. 2005)).  This assertion reflected Judge Marbley's understanding that, "[t]o the extent that an enhancement detracts from a defendant's liberty, its imposition should be considered with extreme scrutiny."  <u>Id.</u>

Similar to Judge Gernter in <u>United States v. Pimental</u>, Judge Marbley's analysis in <u>United</u> <u>States v. Coleman</u> was premised on his view that assessing conduct for which the defendant was acquitted against a standard less than beyond a reasonable doubt eviscerated a criminal defendant's Sixth Amendment right to a jury trial.  <u>See</u> <u>United States v. Coleman</u>, 370 F. Supp. 2d at 668.  Judge Marbley acknowledged that, in <u>United States v. Watts</u>, the Supreme Court had expressly authorized sentencing courts to consider acquitted conduct under a preponderance of the evidence standard, but agreed with Judge Gertner that "[t]he viability of <u>[United States v.] Watts</u> . . . was questioned by

-22-

Justice Stevens' constitutional majority opinion in [United States v.] Booker." United States v. Coleman, 370 F. Supp. 2d at 669. In United States v. Coleman, Judge Marbley noted Justice Stevens' narrow interpretation of the Supreme Court's holding in United States v. Watts, and the Justice's observation that, because the Supreme Court "did not even have the benefit of full briefing or oral argument" in United States v. Watts, "[i]t is unsurprising that [the Supreme Court] failed to consider fully the issues presented" in United States v. Booker. United States v. Coleman, 370 F. Supp. 2d at 669 (quoting United States v. Booker, 543 U.S. at 240 n.4).

Judge Marbley contended that United States v. Booker, read in the context of its predecessors -- Jones v. United States, 526 U.S. 227 (1999), Apprendi v. New Jersey, Ring v. Arizona, 536 U.S. 584 (2002), and Blakely v. Washington -- detracts from United States v. Watts' continued validity. See United States v. Coleman, 370 F. Supp. 2d at 670. Judge Marbley interpreted this line of cases to stand for the proposition that "a judge's determination at sentencing must be guided by the jury-authorized verdict." Id. According to Judge Marbley in United States v. Coleman, even Justice Breyer's remedial opinion in United States v. Booker was not inconsistent with this conclusion, because it "limit[ed] sentences to the jury-authorized statutory maximum," as the United States Code defines that sentence. United States v. Coleman, 370 F. Supp. 2d at 670 (emphasis in original).

With this background, Judge Marbley found it paradoxical that Supreme Court caselaw had "elevated the role of the jury verdict by circumscribing a defendant's sentence to the relevant statutory maximum authorized by a jury; yet, the jury's verdict is not heeded when it specifically withholds authorization." Id. (emphasis in original). Judge Marbley then stated that he was unpersuaded by courts, including the Tenth Circuit, that have attempted to resolve this paradox, and thereby reconcile the holding of United States v. Watts with more recent jurisprudence, "by focusing

solely on the narrow remedial holding of Justice Breyer's opinion" in United States v. Booker.

United States v. Coleman, 370 F. Supp. 2d at 670-71.

In reaching this conclusion, Judge Marbley was critical of the Tenth Circuit's decision in

United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), a case in which the Tenth Circuit upheld

a sentence enhanced on the basis of conduct for which the defendant was acquitted despite

acknowledging a perceived tension in a court's consideration of such conduct.   The Tenth Circuit

in United States v. Magallanez admitted:

> The defendant in this case might well be excused for thinking that there is something
> amiss, under this constitutional principle, with allowing the judge to determine facts
> on which to sentence him to an additional 43 months in prison in the face of a jury
> verdict finding facts under which he could be required to serve no more than 78
> months.

Id. at 683.  Despite this recognition, Judge Marbley, in United States v. Coleman, characterized the

Tenth Circuit's holding in United States v. Magallanez as "upholding the sentence because [United

States v.] Booker did not sever 18 U.S.C. § 3661" -- the provision which states that "[n]o limitation

shall be placed on the information concerning the background, character, and conduct of a person

convicted of an offense which a court of the United States may receive and consider for the purpose

of imposing an appropriate sentence."  United States v. Coleman, 370 F. Supp. 2d at 671 (quoting

18 U.S.C. § 3661).

Judge Marbley was also critical of the Tenth Circuit's limited discussion of the perceptions

that courts' use of conduct for which a defendant was acquitted engender.

> Although the statement about the defendant's perception of his sentence is made in
> passing by the [Tenth Circuit] in [United States v.] Magallanez, this Court notes that
> consideration of acquitted conduct has a deleterious effect on the public's view of the
> criminal justice system.  A layperson would undoubtedly be revolted by the idea that,
> for example, a "person's sentence for crimes of which he has been convicted may be

> multiplied fourfold by taking into account conduct of which he has been acquitted." United States v. Frias, 39 F.3d 391, 393 (2d Cir. 1994)(Oakes, J., concurring). As Judge Oakes opined, "this is jurisprudence reminiscent of Alice in Wonderland . . . As the Queen of Hearts might say, "Acquittal first, sentence afterwards." Id. See also Daniel J. Freed, Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers, 101 Yale L.J. 1681, 1714 (1992)("Most lawyers, as well as ordinary citizens unfamiliar with the daily procedures of criminal law administration, are astonished to learn that a person in this society may be sentenced to prison on the basis of conduct of which a jury has acquitted him, or on the basis of charges that did not result in conviction.").

United States v. Coleman, 370 F. Supp. 2d at 671 n.14. Because Judge Marbley found that "the jury's central role in the criminal justice system is better served by respecting the jury's findings with regard to authorized and unauthorized conduct," he found the Tenth Circuit's reasoning in United States v. Magallenez unpersuasive. United States v. Coleman, 370 F. Supp. 2d at 671 (emphasis in original).

Judge Marbley also recognized collateral consequences of enhancing sentences based on acquitted conduct. He noted that enhancements "would not only affect Defendants' liberty by lengthening the sentences imposed, but would also result in the 'heightened stigma associated with an offense the legislature has selected as worthy of greater punishment.'" United States v. Coleman, 370 F. Supp. 2d at 672 (quoting Apprendi v. New Jersey, 530 U.S. at 467). Judge Marbley stated that, by so using enhancements, "[t]he legal innocence associated with acquittal would be summarily eviscerated." Id. Moreover, Judge Marbley contended that "consideration of acquitted conduct skews the criminal justice system's power differential too much in the prosecution's favor." United States v. Coleman, 370 F. Supp. 2d at 672. In Judge Marbley's view, consideration of acquitted conduct permitted the prosecution "a second bite at the apple," and "allow[ed] the government to perfect its case and ready it for re-litigation at the sentencing 'mini-trial.'" Id.

Finally, Judge Marbley acknowledged that his result was not without any potential drawbacks.   Judge Marbley stated that he was "cognizant that a negative consequence of refusing to consider acquitted conduct is the possibility that 'eliminating the availability of acquitted conduct evidence at sentencing might alter prosecutorial charging decisions.'"   Id. at 673 (internal quotation omitted).  This potential result is because prosecutors might decline to bring certain charges because they fear those charges may result in acquittal and, instead, wait to bring facts supporting those charges to the court's attention as relevant conduct at sentencing.  See id.  While Judge Marbley refused to minimize the import of this concern, he argued that "it simply does not justify overriding jury verdicts of acquittal."  Id.

Despite these concerns that judges around the nation have raised, the Tenth Circuit has spoken clearly that it does not agree with their position.  In United States v. Magallanez, one of the cases that Judge Marbley criticized in United States v. Coleman, the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement findings/analysis, and that United States v. Watts retained vitality.  See United States v. Magallanez, 408 F.3d at 684-85.

United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Pete Magallenez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See id. at 676.  As part of its verdict, the jury, through special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See id. at 682.  The

district court's findings increased the defendant's guideline sentencing range from 63 to 78 months to 121-151 months.  See id. at 682-83.

Magallanez argued that the district court's additional findings with respect to the amount of drugs attributable to him violated Blakely v. Washington.  See id. at 683.  On appeal, Magallanez argued that Blakely v. Washington and United States v. Booker required the district court to accept the jury's special finding of drug quantity for sentencing purposes.  See United States v. Magallanez, 408 F.3d at 683.

The Tenth Circuit in United States v. Magallenez admitted that, "[a]t first blush, there might seem to be force to [Magallenez'] argument," and noted that "[t]he constitutional violation identified in Blakely [v. United States] and [United States v.] Booker, after all, was the Sixth Amendment right to trial by jury."  United States v. Magallanez, 408 F.3d at 683.  The Tenth Circuit countered, however, that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  Id. at 684.  The Tenth Circuit in United States v. Magallenez cited United States v. Watts and stated that, in that case, it was significant that the Supreme Court had held that the Ninth Circuit's decisions conflicted not only with the Sentencing Guidelines, but with the "clear implications of 18 U.S.C. § 3661."  United States v. Magallanez, 408 F.3d at 684 (quoting United States v. Watts, 519 U.S. at 149).  The Tenth Circuit reasoned that, because the Supreme Court had stated in United States v. Watts that the Guidelines did not alter the unlimited nature of the information 18 U.S.C. § 3661 authorized sentencing courts to consider, "it follows that the [Supreme] Court's partial invalidation of the Guidelines in [United States v.] Booker could not have altered it, either."  United States v. Magallenez, 408 F.3d at 684

(citing United States v. Watts, 519 U.S. at 152).

The Tenth Circuit supported its conclusion by arguing that the decision in United States v. Watts "was predicated on the rationale that 'different standards of proof . . . govern at trial and sentencing.'"  United States v. Magallanez, 408 F.3d at 684 (quoting United States v. Watts, 519 U.S. at 155).  The Tenth Circuit continued by acknowledging the Supreme Court's recognition in United States v. Watts that "[a]n acquittal by the jury proves only that the defendant was not guilty beyond a reasonable doubt," and that "[b]oth before and under the Guidelines, facts relevant to sentencing have generally been found by a preponderance of the evidence."  United States v. Magallanez, 408 F.3d at 684 (citing United States v. Watts, 519 U.S. at 156).  Consistent with this interpretation of United States v. Watts, the Tenth Circuit held that "[a] jury verdict of acquittal on related conduct, therefore, 'does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct  has been proved by a preponderance of the evidence.'"  United States v. Magallanez, 408 F.3d at 684 (quoting United States v. Watts, 519 U.S. at 157).

In a footnote to its opinion in United States v. Magallenez, the Tenth Circuit acknowledged Justice Stevens' language in United States v. Booker -- the language that Judge Marbley references in United States v. Coleman -- that calls into question the vitality of United States v. Watts after the Supreme Court's decision in United States v. Booker.  See United States v. Magallenez, 408 F.3d at 684 n.1.  The Tenth Circuit concluded, however, that, because Justice Stevens, in United States v. Booker, distinguished United States v. Watts, and stated that "[n]one of our prior cases is inconsistent with today's decision," United States v. Booker, 543 U.S. at 241, United States v. Watts "remains good law, and it is not the place of an inferior court to overrule it," United States v.

Magallenez, 408 F.3d at 684 n.1.  Consequently, the Tenth Circuit concluded "[n]othing in [United States v.] Booker changes this analysis."  United States v. Magallenez, 408 F.3d at 684.

To the contrary, the Tenth Circuit noted that, "18 U.S.C. § 3661, which underlay the decision in [United States v.] Watts, remains in full force."  United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker made  the Guidelines "effectively advisory," the Tenth Circuit in United States v. Magallenez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before."  United States v. Magallanez, 408 F.3d at 685 (internal citation omitted).  In the Tenth Circuit's estimation, "the only difference is that the court has latitude, subject to reasonableness review, to depart from the resulting Guideline ranges."  Id.

## OBJECTIONS TO THE PSR

Zuni has made a number of factual and legal objections to the PSR.  Zuni's primary argument is that the USPO erred in finding by a preponderance of the evidence that Zuni engaged in the conduct underlying Count 2, and applying that conduct as relevant conduct in calculating Zuni's adjusted offense level.  Zuni argues that, when a jury acquits a defendant of conduct underlying a particular charged count, a sentencing court may not consider that conduct for sentencing purposes without violating the Sixth Amendment.  Because the Court believes that the USPO constitutionally considered conduct for which Zuni was acquitted, but that the United States did not prove that conduct by a preponderance of the evidence, the Court will overrule his objections in part and sustain them in part.

### 1.    Disclosure Date.

The PSR states that the original disclosure date of the report to the parties was November 3,

2006.  See PSR at 2.  In his written objections, Zuni objected to this date and asserted that the PSR was disclosed on November 7, 2006.  See Zuni's Objections at 1.  At the sentencing hearing, Zuni's counsel conceded that the discrepancy was immaterial and withdrew his objection.  See Transcript of Sentencing Hearing at 4:4-6 (Twohig)(taken January 10, 2007)("Transcript").[3]  Based on Zuni's counsel's representation at the sentencing hearing, the Court will consider the objection withdrawn and dismiss it as moot.

       2.       **Sexual Assault.**

Paragraph 5 of the PSR asserts, in pertinent part, that Zuni kidnaped and sexually assaulted his ex-girlfriend, Billy.  See PSR ¶ 5, at 3.   Zuni counters that he was acquitted of sexual assault, and that the evidence does not support a finding that there was a sexual assault, but rather it indicates that Zuni and Billy engaged in consensual sexual intercourse.  See Zuni's Objections at 1.  In its addendum, the USPO responded that, although the evidence was not sufficient for the jury to find beyond a reasonable doubt that Zuni sexually assaulted Billy, it was sufficient to conclude that Zuni committed the offense by a preponderance of the evidence.   See Second Addendum to the Presentence Report at 1 ("Second Addendum").

Zuni complains that the USPO's assertion is not accompanied by any analysis and does not reference evidence in the record that supports the Court making a finding different from the jury's verdict.  See Zuni's Objections at 1.  Zuni contends that the USPO's assertion is inaccurate and requests that the Court delete it from the PSR.  See id. at 2.  Zuni states that, in addition to impacting a defendant's sentence under the Guidelines, a finding that a defendant committed sexual assault or

---

       [3]The Court's citations to the transcript of the sentencing hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

other sexual misconduct impacts the Bureau of Prisons' classification and placement of a defendant. See id. at 2 n.1. Finally, Zuni contends that the Sixth Amendment and the Double Jeopardy Clause prohibit the Court from finding that Zuni committed the crime for which he was acquitted. See id. at 5.

The Court believes that, consistent with the Tenth Circuit's reaffirmation of its adherence to United States v. Watts in United States v. Magallenez, it is obligated to consider all the evidence in the record and determine by a preponderance of the evidence whether sexual assault was committed in this case. At this stage in the proceedings, a district court is obligated to put aside the jury verdict, and to make a factual finding just as if it were the finder of fact at trial. Nevertheless, the Court acknowledges that Zuni vigorously opposed the charge of sexual assault at trial and did so successfully to the extent that the jury concluded the United States had not proven Zuni sexually assaulted Billy beyond a reasonable doubt.

The Court also is not convinced by a preponderance of the evidence that Billy was afraid Zuni would kill her if she refused his sexual advances. There was evidence presented at trial that she did not make any attempt to flee the scene or to obtain assistance after she and Zuni arrived at El Morro. The evidence indicates that there was a gap of time between Zuni choking her, threatening her, and when he demanded or requested sexual intercourse. In sum, the Court is not convinced by a preponderance of the evidence that Zuni committed the offense for which he was acquitted.

Billy testified that, while at El Morro, she did not cry out for help or seek assistance. There was no evidence that Zuni applied any force on her to compel intercourse. Although there was some evidence that Billy told Zuni to stop his advances on several occasions, it appears that her primary concern was that others would see them.

Billy testified that she told Zuni she did not want intercourse because her stomach was hurting, but admitted that she had used this complaint in the past when she did not want to continue intercourse.  Accordingly, there was evidence that the sexual activity Billy and Zuni engaged in on the day of the offense followed a pattern in which they had engaged during previous sexual encounters that did not involve sexual assault.  Similarly, Billy testified that when she told Zuni to stop because her stomach was hurting while the two were engaged in sexual intercourse in her vehicle, they changed positions as they had often done in the past when she had falsely complained about her stomach hurting.  Moreover, the testimony regarding the positions the sexual activity occurred does not seem to be consistent with a finding of sexual assault.

The Court also notes that Billy was driving the vehicle.  While the Court does not wish to speculate as to how easily she could have driven away from Zuni, there was some evidence that she could have done so.  Moreover, the Court believes that, while at El Morro, there were witnesses to whom she could have made it clear that she was being assaulted.  One witness, Officer Moosman, appeared in court, and was a large person to whom Billy could have turned for help.  Indeed, on cross-examination, Billy admitted that she was aware that law enforcement personnel were present at El Morro and that she could have communicated to those people.

With respect to the kidnaping, whenever it began along the highway, the Court finds by a preponderance of the evidence that it ended when Zuni and Billy arrived at El Morro and Billy was either free to escape from Zuni or to get assistance.  Consequently, the Court does not believe that the sexual intercourse that occurred at that location can be characterized as the product of coercion or, more specifically, from the coercion of the kidnaping.

The Court reaches a similar result when it considers the additional incidents of sexual

intercourse that took place after Billy drove the car back toward Gallup.  While the Court acknowledges that those acts were not charged, it must take those acts into account as part of its relevant conduct analysis.  Because the Court has concluded by a preponderance of the evidence that the kidnaping had ended by that point, the Court does not find that the act of kidnaping was for a sexual purpose or that Zuni exploited the kidnaping confinement to compel sexual intercourse.

In sum, the Court does not find by a preponderance of the evidence -- based on the evidence that it heard at trial, given under oath, and subject to cross-examination -- that a sexual assault took place.  The Court will sustain Zuni's objection to paragraph 5 and will strike the statement that Zuni sexually assaulted Billy.

      **3.**      **Paragraph 7.**

Zuni argues that paragraph 7 of the PSR, which describes threats and a physical altercation between Zuni and Billy at the beginning of their encounter on the day of the offense, omits important facts.  See Zuni's Objections at 5.  At the hearing on this motion, Zuni's counsel acknowledged that the USPO had added the facts he wished included in its Second Addendum.  See Transcript at 28:18-20 (Twohig); Second Addendum at 2.  The Court will dismiss Zuni's objection to paragraph 7 as moot.

      **4.**      **Paragraph 8.**

Paragraph 8 of the PSR describes a sexual encounter between Zuni and Billy.  Zuni objects to the contents of paragraph 8 because it described the incident solely from Billy's standpoint, and omitted Zuni's version of the encounter.  See Zuni's Objections at 5.   In its Second Addendum, the USPO noted that the information in paragraph 8 was obtained from an interview with Billy that an investigator from the McKinley County Sheriff's Office conducted.  See Second Addendum at 2.

The USPO represents that Zuni's version of the encounter is included in the PSR at paragraphs 12 through 15.  See id.

At the sentencing hearing, Zuni's counsel requested that, because of the Court's finding that the United States did not prove Zuni sexually assaulted Billy by a preponderance of the evidence, the details of the alleged sexual encounter be removed from the PSR.  See Transcript at 29:1-3 (Twohig).  Because the Court believes that, if these rulings should be reviewed, it is important that the appellate court have a comprehensive understanding of all the information the Court considered and of what the alleged victim's and the defendant's versions of the events were, the Court will overrule Zuni's objection to paragraph 8.

     **5.**       **Paragraph 9.**

Paragraph 9 of the PSR describes a sexual encounter between Zuni and Billy that took place in Billy's vehicle during the return trip from El Morro to Gallup.  Zuni objects to the contents of paragraph 9 because it characterized the encounter as non-consensual.  See Zuni's Objections at 6. In its Second Addendum, the USPO noted that the information in paragraph 9 was obtained from an interview with Billy that an investigator from the McKinley County Sheriff's Office conducted. See Second Addendum at 2.  The USPO represents that Zuni's version of the encounter is included in the PSR at paragraphs 12 through 15.  See id.  Because the Court feels that, if these rulings should be reviewed, it is important that the appellate court have a comprehensive understanding of all the information the Court considered and of what the alleged victim's and the defendant's versions of the events were, the Court will overrule Zuni's objection to paragraph 9.

     **6.**       **Paragraphs 12-15.**

Paragraphs 12 through 15 of the PSR purport to be Zuni's account of the incident that

constitutes the basis for the sexual assault charge against him.  Zuni objects to these paragraphs, contending that his trial testimony was not included in these paragraphs.  See Zuni's Objections at 6.  Zuni contends that the paragraphs contain primarily the portions of statements he gave to investigators that incriminate him, and that, in his trial testimony, he described how the sexual incidents between himself and Billy occurred and explained that they were consensual.  See id. at 7.

Because the Court feels that, if these rulings should be reviewed, it is important that the appellate court have a comprehensive understanding of all the information the Court considered and of what the alleged victim's and the defendant's versions of the events were, the Court will sustain Zuni's objection to paragraphs 12 through 15. To ensure that Zuni's version of events is accurately recorded in the PSR, the Court will order that the USPO draft two paragraphs that summarize what occurred at trial and document Zuni's version of the contested events.

### 7.    Paragraph 27.

Paragraph 27 of the PSR states, in pertinent part, that Billy wished to prevent Zuni from learning about her sexual involvement with Daniel Notsinneh.  See PSR ¶ 27, at 10.  In his written objections, Zuni asserted that "Notsinneh" should be replaced with "Naswood."  Zuni's Objections at 7.  At the hearing on this motion, Zuni's counsel indicated that he was incorrect, that Notsinneh was the correct name, and that the objection was withdrawn.  See Transcript at 32: 1-4 (Twohig). The Court will dismiss Zuni's objection to paragraph 27 as moot.

### 8.    U.S.S.G. § 2A4.1(b)(5).

Pursuant to U.S.S.G. § 2A4.1(b)(5), the USPO added six levels to Zuni's base offense level because his kidnaping victim, Billy, was sexually exploited.  See PSR ¶ 36, at 14.  The USPO based

this enhancement on its conclusion that the victim was sexually abused.  See id.  Zuni objects to

paragraph 36, repeating his argument that the sexual activity in which he and Billy engaged was

consensual, and states that he did not kidnap Billy for a sexual purpose nor did he exploit the

kidnaping confinement to engage in sexual intercourse.  See Zuni's Objections at 9.  Because the

Court has already found that the United States did not prove that Zuni sexually assaulted Billy by

a preponderance of the evidence, it will sustain Zuni's objection to paragraph 36.

**9.     Obstruction of Justice.**

The USPO recommended that the Court add two levels to Foghorn's base offense level for

obstruction of justice pursuant to U.S.S.G. § 3C1.1.  See PSR ¶ 39, at 14.  The USPO asserts Zuni

provided false testimony about the events and methods concerning the kidnaping charge upon which

he was convicted.  At the sentencing hearing, the United States' counsel referred to Zuni's

contentions that he did not grab the steering wheel of Billy's car during the period that he compelled

her to drive to El Morro, and that he did not choke Billy.  See Transcript at 34:14-19 (Barth).

Zuni argues that his statement that he did not grab the steering wheel is not material to his

kidnaping conviction.  See Transcript at 35:15-24 (Twohig).  He also contends that his trial

testimony can be reconciled with Billy's statements and the jury's verdict on the kidnaping charge.

Zuni represents, for example, that he did not deny that the seat belt choked Billy when he attempted

to reach across her for her mobile phone; he contends that he testified that he was not trying to choke

her when that occurred.  See id. at 36:1-4.

The Guidelines instruct that the enhancement for obstruction of justice "is not intended to

punish a defendant for the exercise of a constitutional right."  U.S.S.G. § 3C1.1 cmt. n.2.  When

considering allegedly false testimony, the court is "cognizant that inaccurate testimony or statements

sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." Id.

The Court agrees that Zuni's testimony and his statements regarding the choking of Billy can be reconciled with her statements and with the other evidence that the United States has presented. The Court also believes, however, that his statements regarding whether he grabbed the steering wheel while Billy was driving are material, and therefore, if he gave false testimony to that regard, the Court should overrule his objection to the obstruction-of-justice enhancement.

The Court acknowledges that Zuni's testimony related to a very emotional time for both himself and Billy. The Court believes that it is very possible that Zuni's testimony was based on his own recollection of some very detailed events that were taking place during an emotional time, and that a difference in the memories of Zuni and Billy does not necessarily indicate that Zuni was attempting to obstruct justice. The United States bears the burden to prove that Zuni deliberately made false and intentionally misleading statements, and the Court does not believe that it has made that showing by a preponderance of the evidence. The Court believes that discrepancies between the victim's version of events, the jury's finding, and Zuni's testimony could be the result of confusion during an emotional time and faulty memory, and therefore does not find by a preponderance of the evidence that Zuni willfully obstructed justice. The Court will sustain Zuni's objection to the obstruction-of-justice enhancement.

## 10.    Offense Level.

Zuni objects to paragraphs 40 and 42 of the PSR, which indicate that his calculated offense level is forty. Because the Court has sustained Zuni's objections to the USPO's enhancements under U.S.S.G. §§ 2A4.1(b)(5) and 3C1.1, the Court has calculated Zuni's offense level to be thirty-two.

The Court will sustain Zuni's objections to paragraphs 40 and 42 and will change his offense level to thirty-two in both paragraphs.

      11.    **Paragraphs 55 and 56.**

Paragraph 55 of the PSR refers to a welfare check that Navajo Tribal Police made to Billy's residence on June 13, 2003, following an argument between Zuni and Billy. Paragraph 56 references a Gallup Police Department offense report that documents a restraining order violation Zuni committed against Billy. Zuni contends that there were no arrests related to either of these incidents and therefore the paragraphs should be stricken from the PSR. See Zuni's Objections at 11. Zuni argues that there is no evidence to support these allegations. See id.

The Court believes that, consistent with 18 U.S.C. § 3661, it is proper for it to consider these allegations, and will therefore leave the information in the PSR. The Court will edit the PSR, however, to clearly indicate that there were no arrests associated with these incidents. Zuni's objections to paragraphs 55 and 56 are therefore overruled in part and sustained in part.

## ANALYSIS

Zuni urges the Court to vary from the sentence the Guidelines produce consistent with its authority under United States v. Booker. Zuni asserts that, because of his background as a former law enforcement officer, he will likely have to serve his sentence in solitary confinement, and thus his sentence will have a harsher impact on him than the sentences of other similarly situated defendants. See Zuni's Objections at 11; Transcript at 47:21-48:2 (Twohig). The United States opposes a variance from the guideline imprisonment range. The United States emphasizes that Zuni's offense of conviction was not an isolated incident, and that, as explained in the PSR, Zuni has a history of threatening behavior and domestic disturbance. See Transcript at 52:20-53:2 (Barth).

The United States also maintains that Zuni's status as a former police officer does not make his case particularly unusual and that the Bureau of Prisons has the ability to incarcerate Zuni in a safe environment.  See id. at 53:6-12.

The Court acknowledges that Zuni's sentence is very likely to be under lockdown and that this reality may make his imprisonment more difficult than that of other prisoners.  Nevertheless, while the Court believes that these circumstances may counsel for a sentence at the low-end of the guideline range, it does not believe that they are adequate grounds to vary from the Guidelines. While Zuni has characterized his offense as a family feud involving emotional issues related to custody of his and Billy's children, and to accusations of infidelity, the Court must remain mindful that Zuni has been convicted of kidnaping, that his offense involves domestic violence, and must not minimize the seriousness of the conviction because of the context in which it occurred.

The Court also notes that, while Zuni was previously a police officer and does not have any other criminal convictions, the evidence in the record also suggests that he has had problems in the past with relationships and, specifically, relationships with women.  Similarly, while the Court is convinced that Zuni's children are very important to him, and is cognizant that he will be separated from them for an extended period, it does not believe that this factor counsels for a variance from the guideline imprisonment range.

In sum, the Court believes that a guideline sentence reflects the seriousness of the offense for which Zuni was convicted.  The guideline sentence promotes respect for the law, provides just punishment for what occurred on the day of the offense, and affords adequate deterrence.  Because of the length of time that Zuni will be incarcerated, the Court believes the guideline sentence protects the public, and, because of the recommendations that the Court will make associated with Zuni's

-39-

incarceration and supervised release, provides Zuni with the training and counseling he needs to deal with some of the problems he has.

The Court believes that the sentence the Guidelines produce reflects the factors enumerated in 18 U.S.C. § 3553(a) pertinent to the Court's analysis under United States v. Booker, and that the sentence is reasonable.  The Court believes the sentence is sufficient, without being greater than necessary, to comply with the purposes of the Sentencing Reform Act.

**IT IS ORDERED** that the Defendant's Sentencing Memorandum and Objections to Presentence Report are sustained in part and overruled in part.  The Court will not grant a variance from the guideline imprisonment range.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

David C. Iglesias
    United States Attorney for the
      District of New Mexico
Charles L. Barth
Fred C. Smith
    Assistant United States Attorneys
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Ray Twohig
Ray Twohig, P.C.
Albuquerque, New Mexico

      *Attorney for the Defendant*

-40-